HESTER SHERMAN et al., Appellants, *v.* THOMAS KANE et al., Respondents.

Where title to land has been acquired by twenty years' adverse possession, it is equally strong as one obtained by grant, and is not forfeited by an interruption of the actual occupation thereafter.

A grantor with warranty may, subsequent to the delivery of his grant, originate an adverse possession, and is not estopped from asserting the same by the covenant of warranty.

The city of New York may for corporate purposes acquire title to lands by adverse possession.

In 1801, the city of New York sold to W. lot 194, of its " common lands," so called, the deed describing it as then being in the possession of W. There was a line clearly marking K.'s possession on the south.  In 1804, the city leased lot No. 193, adjoining lot 194 on the south; there was then a wall line clearly marking W.'s possession on the south.  The tenants of the city occupied lot 193 from the. time of said leasing continuously up to 1852, having possession and cultivating up to the said line, W. and his successors in interest occupying north of the line.  The city also paid assessments on the land up to said line.  In proceedings to open a street across the lots the city treated lot No. 194 as only extending south to said line, paying S., plaintiff's ancestor and the successor to the title of W., the amount awarded, which he received without dissent or claim of title south of the line.  Upon the city maps said line was recognized as the boundary between the lots.  From 1852 up to 1866 the lands south of said line remained vacant; in the year last mentioned, they were sold by the city to defendant K.  In an action of ejectment brought to recover a parcel of land lying south of said line, *held*, that if the same was covered by the description in the

deed to W., the city reacquired title by adverse possession ; that its possession could not be presumed to have been in subordination to W.'s title; and that the title so acquired was not lost by the failure to occupy after 1852.

In 1851, the city executed to S. a release of ground-rent on lot 194. *Held,* that this did not affect its title, as it was evidently intended to only embrace lot No. 194, as then possessed by S.

*It seems,* that the facts disclose a practical location of the boundary line between the two lots and an acquiescence by the adjoining owners, which is conclusive upon them and their successors in interest.

*House* v. *McCormick* (57 N. Y. 310), distinguished and limited ; *Wilklow* v. *Lane* (37 Barb. 244), limited.

(Argued April 20, 1881; decided October 4, 1881.)

APPEAL from judgment of the General Term of the Superior Court of the city of New York, entered upon an order made June 18, 1880, which affirmed a judgment in favor of defendants, entered upon a decision of the court on trial without a jury.

This was an action of ejectment brought to recover a parcel of land in the city of New York, to which plaintiffs claimed title as heirs at law of Alpheus Sherman, deceased.

*T. Mitchell Tyng* for appellants. The description contained in the deed, construed as to metes and bounds, in conformity with the intention of the parties, governs all other general descriptions and specifications therein. (*Jones* v. *Smith,* 73 N. Y. 205.) The court must gather the intent of the parties from the description of the premises, read in connection with the other parts of the deed, and by reference to the situation of the lands, and the condition and relation of the parties to those and other lands in the vicinity. (*Mott* v. *Mott,* 68 N. Y. 246, 253 ; *Mitchell* v. *Bartlett,* 51 id. 447 ; 2 R. S. [6th ed.] 1119, § 159 ; id. 1130, § 2.) The possession by Walker of lot No. 194, and by Anthony Smith of lot No. 193, at and prior to the delivery of the deed to Walker from the city, conclusively proves that the only post-road existing on the soil, on the 30th December, 1803, was the new post-road, and this fact required an adjudication that the eastern boundary of the

land conveyed was the "new post-road." (*Rich* v. *Rich,* 16 Wend. 663; *Glover* v. *Shields,* 32 Barb. 374; *Wallace* v. *Fee,* 50 N. Y. 694.) A defense of the statute of limitations, adverse possession, or other plea of forfeiture, must be strictly averred and proved. (*Jackson* v. *Bonnell,* 9 Johns. 163.) The mayor, aldermen and commonalty of the city of New York can predicate no defense to this action on their possession and occupation of the land in question during the forty-nine years intermediate the delivery of their deed to Walker, 30th December, 1803, and the year 1852, when their actual possession of the land was abandoned. (*Jackson* v. *Burton,* 1 Wend. 341; *Jackson* v. *Aldrich,* 13 Johns. 106; *Burham* v. *Van Zandt,* 7 Barb. 91, 100; *Wilklow* v. *Lane,* 37 id. 244, 248; *Zeller's Lessee* v. *Eckert,* 4 How. [U. S.] 289; *Phelan* v. *Kelly,* 25 Wend. 689; *Knolls* v. *Barnhart,* 71 N. Y. 474; *Jackson* v. *Burton,* 1 Wend. 341.) The covenant of warranty contained in the deed to Walker from the city estops the corporation from asserting the adverse possession to the land which the defendants claim in this action. (*House* v. *McCormick,* 57 N. Y. 310; *Pope* v. *Hammer,* 74 id. 240, 242.) The deed to Sherman estops defendants from claiming an adverse possession of the premises at the date of the transaction, November 2, 1835, or at the date of the delivery of the release in the year 1851. (*Devyr* v. *Schaeffer,* 55 N. Y. 446, 451.)

*Francis Lynde Stetson* for respondents. Where a tract of land is known by a certain name or designation, the extent to which that name has been applied may be shown by general reputation, and the rights of parties who deal in that tract may thus be controlled by that kind of evidence. (Cowen & Hill's note 87 to Phill. Ev. [Edw. ed.], 1868, vol. 1, pp. 180*, 220.) The lot conveyed had a definite *situs.* (*Jackson, ex dem. Livingston,* v. *Freer,* 17 Johns. 29; *Van Wyck* v. *Wright,* 18 Wend. 157.) The proof as to the actual extent of Walker's possession is the most trustworthy identification of the premises intended to be conveyed. (*Ralston* v. *Miller,* 3 Rand. 44–49.) The grant was to be construed, not only according to its terms,

but as nearly as possible according to the intention of the parties, as the same could be ascertained, from antecedent and surrounding facts and circumstances. (*Blossom* v. *Griffin*, 13 N. Y. 569.) From the instrument, it appeared that it was the intention of the parties that the grant should convey lot 194, as it was on May 1, 1801, the day on which the instrument was dated, and presumptively delivered. (*The People* v. *Snyder*, 41 N. Y. 397; *Carnes* v. *Platt*, 9 J. & S. 435.) Parol evidence was admissible to show that the day of date was not the day of delivery. (4 East, 477–481; 10 Exch. 430.) In equity, Walker was the owner of the lot from the day of the sale, and if between that day and the day of delivery of the deed, there was any change in the boundaries of the premises, Walker could not urge his own neglect as a ground for the enlargement of his right upon the deed. (*Hathaway* v. *Payne*, 34 N. Y. 92, 103.) This was a proper case for invoking the well-established doctrine of relation, according to which a deed shall be interpreted as of the day on which the preliminary sale and contract was made. (*Heath* v. *Ross*, 12 Johns. 140; *Jackson* v. *Ramsey*, 3 Cow. 75–80; *Judd* v. *Seekins*, 62 N. Y. 266–270; *Simpson* v. *Cloonan*, 47 id. 3–14.) Where, in pursuance of an executory contract, a deed or other written instrument is given and received, there is not necessarily a waiver or merger of the previous executory contract, but in absence of evidence to the contrary, it is to be presumed that the conditions of the original contract are to be entirely fulfilled. (*Morris* v. *Whitaker*, 20 N. Y. 41; *Hutchins* v. *Hebbard*, 34 id. 24; *Johnson* v. *Hathorn*, 3 Keyes, 126; *Blossom* v. *Griffin*, 13 N. Y. 569.) The burden of proving the alteration was on the plaintiffs, and without such proof, the presumption was necessarily that things continued as they were. (*Wilkins* v. *Earle*, 44 N. Y. 172–192.) Even though the premises in suit had been neither to the south nor to the east of the premises conveyed to Walker, the city's conceded actual occupation and usual cultivation for forty-eight years, that is, from and after the delivery of the deed to Walker in 1804, until 1852, was a perfect bar to the action. (*East River Nat. Bk.* v. *Gove*, 57 N. Y.

597 ; *La Frombois* v. *Jackson,* 8 Cow. 589–603 ; *Doe* v. *Lawley,* 13 Q. B. 954 ; *Sherry* v. *Frecking,* 4 Duer, 452 ; *Crary* v. *Goodman,* 22 N. Y. 170 ; *Finlay* v. *Cook,* 54 Barb. 9 ; *Doolittle* v. *Tice,* 41 id. 181–185 ; *Doe* v. *Rees,* 6 Carr. & Payne, 610 ; *Dempsey* v. *Kipp,* 61 N. Y. 462–470 ; *Doe* v. *Jones,* 15 M. & W. 580 ; *Andrews* v. *Hails,* 2 E. & B. 349 ; *Doe* v. *Tidbury,* 14 C. B. 304 ; *Liaburne* v. *Daniels,* L. R., 1 C. P. 260 ; 1 Washburne on Real Property [4th ed.], 556, § 1 *a* ; Code of Civil Procedure, § 373 ; *Wilklow* v. *Lane,* 37 Barb. 244 ; 9 Johns. 182 ; Co. Litt. 374 *a;* Bacon's Abridgment, title Evidence, F. ; Bouvier's Philadelphia edition [1860], vol. 3, 600 ; 2 Blackst. Com. 315 ; *Traip* v. *Traip,* 57 Me. 268 ; *Tilton* v. *Emery,* 17 N. H. 536, 538 ; *Stern* v. *Hendersass,* 9 Cush. 497, 501 ; *Greenleaf's Executors* v. *W*——, Dyer, 42 *a ; Holland* v. *Jackson,* J. Bridgman, 77 ; *Smith* v. *Montes,* 11 Tex. 24 ; *House* v. *McCormick,* 57 N. Y. 310–320 *Kent* v. *Harcourt,* 33 Barb. 497 ; *Zeller's Lessee* v. *Eckert,* 4 How. [U. S.] 289–296 ; 16 Johns. 301 ; 5 Cow. 74 ; *Millard* v. *McMullen,* 68 N. Y. 345–352 ; *Clapp* v. *Bromagham,* 9 Cow. 530, 532 ; *Ricard* v. *Williams,* 7 Wheat. 60 ; *Jackson, ex dem. Bradt,* v. *Whitbeck,* 6 Cow. 632 ; *Van Dyke* v. *Van Buren,* 1 Caines, 83–90 ; *Humbert* v. *Trinity Church,* 24 Wend. 587–601 ; *Woolsey* v. *Morse,* 19 Hun, 273 ; *Frederick* v. *Gray,* 10 Serg. & Rawle, 182–188 ; 9 Watts, 363 ; 9 Cow. 530 ; 6 id. 632 ; 17 Wend. 642 ; 46 N. Y. 182 ; 9 Penn. St. 226 ; *Parker* v. *Proprietors of Locks and Canals on the Merrimack River,* 3 Metc. 91 ; 102 ; *Clark* v. *Gilbert,* 39 Conn. 94–97 ; *Ellicott* v. *Pearl,* 10 Peters, 432–442 ; *Ewing* v. *Burnett,* 11 id. 41–52 ; *Chautauqua Co. Bk.* v. *Risley,* 19 N. Y. 369–381 ; Dillon on Municipal Corporations, § 444 ; 1 Hoffman's Laws Relating to New York, 12 ; *Witt* v. *Mayor,* 6 Robt. 441–452 ; Angell & Ames on Corporations [10th ed.], § 186 ; *Milton* v. *First Parish in Milton,* 10 Pick. 447, 452 ; *Robie* v. *Sedgwick,* 35 Barb. 319 ; *Harpending* v. *The Dutch Church,* 16 Peters, 455 ; *Bogardus* v. *Trinity Church,* 4 Sandf. Ch. 633 ; 3 Washburn on Real Property [4th ed.], 163 ; *Ewing* v. *Burnett,* 11 Peters, 41–54 ; *Jackson* v. *Baird,* 4 Johns. 230–234 ; *Hall* v. *Cazenove,* 4

East, 477–481 ; *Jayne* v. *Hughes,* 10 Exch. 430.)   For more
than twenty years before the beginning of this action, there
having been an acquiescence in the practical location of the
line " D D " on the part of all parties interested therein or af-
fected thereby, such location is now conclusive upon all such
parties.   (*Scott* v. *Pilkington,* 15 Abb. 280–284 ; *Munro* v.
*Potter.* 34 Barb. 358–360 ; *Gillespie* v. *Torrance,* 4 Bosw.
36–46 ; *Hayden* v. *Palmer,* 2 Hill, 205 ; affirmed, 7 id. 385 ;
*Kirby* v. *Sisson,* 2 Wend. 550 ; *Brown* v. *Bowen,* 30 N. Y.
519, 541, 542 ; *Shorter* v. *The People,* 2 id. 193–203 ; *The
People* v. *White,* 55 Barb. 606–613 ; *Ratcliffe* v. *Gray,* 3
Keyes, 510 ; *Jackson* v. *Rowen,* 1 Caines, 358 ; *Jackson* v.
*Dysling,* 2 id. 198 ; *Jackson* v. *Dieffendorf,* 3 Johns. 268,
363 ; *Jackson* v. *Ogden,* 7 id. 238, 246 ; 7 Cow. 761 ; *Jack-
son* v. *Freer,* 17 Johns. 29 ; *Rockwell* v. *Adams,* 7 Cow. 761 ; 6
Wend. 467 ; *McCormick* v. *Barnum,* 10 id. 105 ; *Kip* v. *Nor-
ton,* 12 id. 127 ; *Adams* v. *Rockwell,* 16 id. 285 ; *Jackson* v. *Mc-
Connell,* 19 id. 174 ; *Clark* v. *Wethey,* id. 320 ; *Baldwin* v.
*Brown,* 16 N. Y. 359 ; *Reed* v. *Farr,* 35 id. 113, 116 ; *Ratcliffe*
v. *Gray,* 3 Keyes, 510–513 ; *Corning* v. *Troy Iron and Nail
Factory,* 44 N. Y. 577 ; *Jones* v. *Smith,* 64 id. 180 ; *Jackson* v.
*Ogden,* 4 Johns. 140 ; *Vosburg* v. *Teator,* 32 N. Y. 561 ; *Swett-
enham* v. *Leary,* 18 Hun, 284 ; *Donohue* v. *Case,* MSS. opinion,
EARL, J. ; *Dibble* v. *Rogers,* 3 Wend. 536 ; *French* v. *Pearce,* 8
Conn. 439 ; *Sneed* v. *Osborn,* 25 Cal. 619 ; *Cutler* v. *Allison,* 72
Ill. 113 ; *Davis* v. *Judge,* 46 Vt. 655 ; *Coyle* v. *Cleary,* 116 Mass.
208 ; *Miner's Case,* 5 J. & S. 190.)   The proceedings for the
opening of Seventy-ninth street in 1827, and the participation
therein of Alpheus Sherman, determined that the line "D D "
was the southern boundary of lot 194, and seemed sufficient to
conclude the plaintiffs from claiming lands south of the present
south line of Seventy-ninth street.   (*Embury* v. *Conner,* 3 N.
Y. 511 ; *Matter of John and Cherry Streets,* 19 Wend. 659–
663 ; *Matter of William St.,* id. 678–688 ; *Pailet* v. *Youngs,*
4 Sandf. 50–55 ; *Matter of Arnold,* 60 N. Y. 26 ; *Dolan* v.
*Mayor,* 62 id. 472 ; *In re Dept. of Parks,* 73 id. 560–564.)

MILLER, J.   One of the most serious questions litigated upon the trial of this action relates to the right of the city to hold the premises in question by an actual occupation and cultivation for a period of time which entitled it to claim title to the same by an adverse possession.   The evidence upon the trial tended strongly to establish such possession.   It appeared that on the 17th day of January, 1804, the city authorities executed a lease to one Anthony Smith of lot No. 193 of the New York common lands for the term of twenty years from the 1st day of May, 1803.   Prior to that time and in 1801, they had sold to James Walker lot 194, which was stated in the deed " as in his possession now being."   The said léase of lot 193 was assigned by the lessee and afterward by the assignee of the lessee, and during the continuance of the term Smith and his assigns occupied and usually cultivated the premises up to the northerly boundary line of said lot.   On or about the 1st of May, 1823, another lease was executed by the city to one John Robinson, for the term of ten years, which on the 9th of February, 1824, was transferred to his wife, and during the term the premises were occupied and cultivated by said Robinson and his wife under such lease.   At the expiration of the term and up to the year 1852, the premises were also occupied and cultivated by James Willet and his estate under a parol letting of lot 193 of the New York common lands from year to year, and an annual rental was paid to the corporation for the same.   It also was proved that a wall line marked D D, on the Doughty and Ludlow maps, so called, was clearly marked upon the soil as the division line between the possession of those claiming title to lot No. 194, under Walker, and the tenants of lot No. 193, under the lease from the city, and was recognized as the boundary line from 1804, until 1852, and the tenants of the city cultivated next south of said line and paid rent to the city therefor, and that an old stone wall erected on said line continued in existence after the year 1857. It also appears that upon proceedings for the opening of Seventy-ninth street, the city took a triangular gore piece of land lying between the line D D, on the south, and

Seventy-ninth street. on the north, and paid Sherman, the successor of Walker for the same. It thus advised Sherman of the claim of the city, and he never expressed any dissent thereto, and accepted the amount awarded therefor. The city also paid assessments upon the property. It appears beyond controversy that for nearly fifty years the city claimed to own, and by its corporate authorities and by its tenants exercised acts of ownership over the land in question, and that it sold at public auction the south half of the block between Seventy-eighth and Seventy-ninth streets in 1852, and the north half thereof in 1866, and at the latter sale the defendant Kane became the purchaser and took title under a full covenant warranty deed thereof, paying therefor the sum of $30,000 in entire ignorance of any adverse claim.

In order to maintain an action to recover real property or the possession thereof the plaintiff must establish a seizure or a possession within twenty years before suit brought. (Code of Civil Pro., § 365.) An entry to be valid must be made within twenty years after the right to make it exists. (Id., § 367.) The legal presumption is in favor of the person establishing title, unless the premises are shown to have been held adversely to "the legal title for twenty years before the commencement of the action." (Id., § 368.) Within these provisions the evidence upon the trial would seem to establish an adverse possession of over twenty years unless some insupportable difficulty lies in the way, for the period of twenty years certainly ran from the possession at different times, at which as we have seen it was asserted and continued. Various objections are interposed to the claim of adverse possession, which we will, so far as material, proceed to consider. It is urged that, as it is found that from the year 1852 until the month of July, 1866, when Kane entered, the premises were not actually occupied by any one, and an interval of only fourteen years elapsed before the commencement of this action during which Kane was in the actual occupation of the land, claiming title thereto under a written conveyance from the city, the title was lost by the abandonment. The contention is, that the

possession must be twenty years "immediately before or next be-fore" the suit is brought to make out a case within section 368, *supra*. If this construction is correct, then any lapse of time without possession would interfere with the meaning of the statute and bar a title which had become fixed and established by adverse possession. The effect of the position contended for would be, that while in 1852 the defendant's title had be-come perfect by an adverse possession of forty-eight years and it was entitled to the land, its title became forfeited by reason of the premises being allowed to remain unoccupied for four-teen years. If the title had been acquired by grant such an act could not affect or invalidate it, and as a title by adverse possession is equally strong as one obtained by grant, no rea-son exists for making an exception against the latter. A per-fect answer also to the position of the learned counsel is, that the city had title by adverse possession and that title con-tinued after it had become perfect and complete without regard to the interruption of the actual occupation or posses-sion. In 1852, the plaintiff or those they represent would have been barred by the statute. They had no right to the possession or claim to the land, and the fact that the owner did not claim to occupy it or to put any one in possession cannot restore to the former owner the right which he had lost. The city by the adverse possession was in fact in the constructive possession of the land, exercising a right over the same by per-mitting it to remain vacant, and in this form its possession con-tinued the same as if by its agents or tenants it was in the act-ual occupation of the premises. The statute was thus com-plied with, and there was no such interruption in its running as prevents its application or destroys the title which had been previously acquired by adverse possession. By leaving the land vacant the city incurred perhaps the risk of an adverse possession by some other party, but there was no abandonment or surrender of its rights, and that no such intention existed is manifest by the sales made, as already stated, at different times. The evidence offered and excluded upon the trial to show that the taxes and assessments had been borne by the city would

also have negatived any claim of abandonment, and without such testimony, and with no proof whatever to sustain such a claim, the conclusion is irresistible that nothing of the kind was in contemplation or really existed.

The doctrine contended for would preclude the owner of land who had lawfully acquired title by an adverse possession under the statute from a free and full exercise and enjoyment of the right to the use and disposition of the same, and such a construction is not sustained by authority or warranted by any sound principle of law. The position that there was no finding that any adverse possession of the land existed prior to 1822, and that the opinion of the court is to that effect, does not aid the plaintiff's case, for even if the adverse possession commenced at the day last named it would, nevertheless, have continued for a sufficient length of time to establish the title of the city to the premises. It should be noticed that the finding of the judge on the subject, made at the appellant's request, is to the effect that the mayor, etc., after the deed was delivered, remained in the actual possession of the land in dispute, and occupied and cultivated the same until 1852. This comes up to that time and is sufficient, we think, to perfect a title by adverse possession in the city. The further finding, at the request of the defendant's counsel, that from the time of the filing of the Doughty and Ludlow maps in 1822 to 1866 the city claimed to be the owner of two hundred feet south of line D D, which was shown as a boundary line between lots 193 and 194, sustains the adverse possession of the city to that extent up to 1866. The appellant's counsel claims that the lease to Smith did not assume to demise any portion of lot No. 194, which was conveyed to Walker. And that entering upon the demised lands, Smith and his assigns took possession and occupied under the lease lands which were outside of lot No. 193, and included within lot No. 194. As was said in the opinion of the judge upon the trial on the facts and outside of the lease, the city as a fact designated the land in dispute as a part of lot No. 193 which was demised, and placed Smith in possession of it. Such being the fact the city, we think, was

entitled to the benefit of the possession and actual cultivation by its tenants under the lease to Smith from January 17, 1804, which was continued to John Robinson under a prior lease dated May 1, 1823. It is insisted that no actual possession was delivered, and the city remained in possession of the land after it was conveyed to Walker and became a tenant at will to said Walker and his assigns, and such possession was in privity with the legal title and, not having been adverse, could not have become so. The deed to Walker describes the land "in his actual possession," and the judge found that at the time of its delivery, Walker was in possession of the premises thereby conveyed. The proof indicates that Walker probably entered into possession immediately after the public sale in 1801. There is no evidence that the city allowed any one to occupy the premises at any time prior or antagonistic to its grant to Walker. The lease to Smith was executed January 17, 1804, and it appears that the occupancy under it began about twenty days after the delivery of Walker's deed, and possession was most probably given up to the line of Walker's actual possession. As the grantees of Walker were in possession of a portion of the lot, the presumption is that such possession was concurrent with the delivery of the deed, and as the entry of Walker upon a part of the premises presumptively embraced the whole thereof, the lease to Smith and the subsequent occupation and possession under the same evidently was of a hostile character and adverse to the title under which the plaintiffs claim. But even if there was ground for questioning the correctness of the positions last considered and the facts be assumed as claimed by the plaintiffs in reference to the possession of Walker, it does not necessarily follow that the city could not have acquired a title by an adverse possession. Some cases are relied upon by the appellants' counsel to sustain the doctrine contended for. (*Jackson* v. *Burton*, 1 Wend. 341; *Jackson* v. *Aldrich*, 13 Johns. 106; *Burhans* v. *Van Zandt*, 7 Barb. 91; *Wilklow* v. *Lane*, 37 id. 244, 248; *Zeller's Lessee* v. *Eckert*, 4 How. [U. S.] 289. We do not deem it necessary to examine these cases in detail, as the facts differ in many

essential particulars from the case at bar, and it is sufficient to say that they are distinguishable therefrom. In the case first cited in the opinion of the court it is laid down that nothing but a clear, unequivocal and notorious disclaimer of the title of the landlord would render a tenant's possession, however long continued, adverse. It would thus seem that where such a disclaimer is shown, an adverse possession might be acquired within this rule, and upon the trial of this action the proof was abundant to establish there was such a disclaimer on the part of the city and its tenants of the title of any and all persons to any part of the land lying south of the line D D. We are unable to discern any reason why this was not sufficient, even as between the grantor and grantee, to form the basis of a title by an adverse possession. This view is not without authority to support it. (See *Kent* v. *Harcourt*, 33 Barb. 491, 497, where the case of *Jackson* v. *Burton*, *supra*, is cited and commented upon.) The case last cited sustains the doctrine that a grantee who has entered under a conveyance from his grantor may lose his title by an adverse possession of such grantor, and the grantor may thus claim to hold adversely to the grantee. (See, also, *Cramer* v. *Benton*, 4 Lans. 291.)

This doctrine is also upheld by well-considered cases in other States. (*Traip* v. *Traip*, 57 Me. 268; *Tilton* v. *Emery*, 17 N. H. 536; *Stearns* v. *Hendersass*, 9 Cush. 497. See, also, *Grenelife's Ex.* v. *W——*, 1 Dyer, 42 *a* ; *Holland* v. *Jackson*, J. Bridgman, 77.) The claim that the covenant of warranty in the grant to Walker estops the corporation from asserting an adverse possession is not, we think, well supported. The case of *House* v. *McCormick* (57 N. Y. 310, 320) is relied upon to sustain the doctrine contended for, and some of the remarks of the learned judge who wrote the opinion may perhaps tend in that direction, but great stress is there laid upon the question as to the *intention of the parties*, and it was not necessary to decide the question now discussed. The defendant in the case last cited did not claim title by adverse possession. There was a conveyance with a warranty of a fee with no breach of that covenant until a claim of title by the cove-

nantor under a deed subsequent, and possession under that deed for a period less than twenty years. The important question dicided was, that the deed purported to convey the whole of the fee unqualifiedly and not a fee subject to be opened to let in other remainder-men from one of whom the defendant subsequently acquired title. The rule laid down in *Wilklow* v *Lane* (*supra*), that the deed covered any title or interest which might be subsequently acquired is not sustained by the authorities cited to support this proposition, as is shown in the exhaustive opinion of the judge on the trial of this action, and further elaboration is not required. The doctrine, that a grantor with warranty may originate a possession adverse to his grantee and that the adverse possession originated by a party in privity with the true owner differs from that originated by a stranger only in requiring stronger proof, is well established. (*Zeller's Lessee* v. *Eckert*, 4 How. [U. S.] 289, 296.) When there is a disclaimer by the grantor of the title of the grantee subsequent to the delivery of the grant, an adverse possession may be acquired and it is not necessary that such possession should be hostile in its inception. (*Jackson* v. *Brink*, 5 Cow. 483 ; *Millard* v. *McMullin*, 68 N. Y. 345, 352.) The possession here was in conflict with the effect of the deed if it conveyed a fee of the street, and none the less hostile because the grantees recognized the validity of the possession by the city. It was, therefore, hostile in its inception and notorious for a sufficient length of time to establish a title. An exclusive possession and cultivation existed here, as we have seen, for a period of forty-eight years. It was defined by a line as the northern boundary, which is laid down on most all of the maps which were introduced in evidence upon the trial, made by different surveyors in various surveys marked by a division wall and a fence which had existed for many years. This line was fully identified as a boundary and the lots designated as laid down on the maps referred to by witnesses sworn upon the trial, and its notoriety was well understood and established. Nothing could be more open and explicit to show a clear unequivocal and public disclaimer. It may also be remarked that we have been

referred to no decided case which holds that a grantee, who takes possession of a large portion of the land described in the deed of the premises, is entitled to claim or presumed to understand that the portion which is withheld by the grantor is held by him in subordination to the legal title.   When Sherman entered in 1819, he was entitled to claim all the land which was covered by the grant to Walker in 1803, and he took no steps for this purpose.   For thirty years after, the city by its tenants occupied and cultivated, without objections, with no adverse claim of right, or that its possession was subsidiary and in subordination to the title under which the plaintiffs now claim.   Nor is any presumption to be indulged in favor of the claim of title now made which was allowed to rest so long a period of time, and every intendment arising from the evidence is in a contrary direction.

There is, we think, no force in the objection that before the issue of adverse possession can be considered, the court must hold that the plaintiffs under James Walker held the legal title of record to the land.   Without regard to the legal title of the plaintiffs by the conveyance referred to, it is sufficient to defeat the action, and to authorize a judgment for the defendants that the findings upon sufficient evidence establish an adverse possession by the city for a period of over twenty years which is a bar to any right of entry by the plaintiffs. The conclusion in view of the facts is inevitable that the defendants' title is perfect by adverse possession.   And the piece called the gore was acquired by the proceedings to open Twenty-ninth street.

It is further insisted that the city lost whatever title it had acquired by the release of ground-rent on lot No. 194, dated November 2, 1835, to Alpheus Sherman.   This release was not executed until 1851, after the title of the city to the land south of the line D D had become perfect by adverse possession.   It contained no appropriate terms for the conveyance of the portions of the lot which had been acquired by adverse possession or otherwise, and there is no ground for claiming that the release or the commutation had reference to lot No. 194, so far as it was affected by a claim to the lands in dispute.   It

evidently related to and was intended to embrace only lot No. 194, as then possessed by Alpheus Sherman. And the object was to discharge him and his assigns from any future payment of rent for such lot as possessed by him and for which he was bound to pay rent. The rent it would seem had not been apportioned since the opening of Seventy-ninth street, and the small amount paid was in settlement of the same.

There are other difficulties in the way of sustaining this release as a bar to the defendants' title by an adverse possession. It would only take effect from the time of its delivery, which must have been in 1851, when Kingsland, who signed it, was mayor. The authority to insert the clause which would have the legal effect claimed by the plaintiffs is not clear, and no consideration appears for any such covenant or admission. By a reasonable interpretation of its contents and in view of the circumstances it cannot, we think, be claimed that its effect was to avoid and render entirely nugatory the series of acts for a period of about fifty years, which established a title by adverse possession in the city as owner to the land lying next south of the line D D.

Nor is there any valid ground for claiming that the city was not authorized to acquire land by adverse possession for corporate purposes, and had no power to confer authority upon its agents or tenants to maintain a title to lands for which it had no specific grant.

It is insisted by the defendants' counsel that the boundary line between lot No. 194 and lot No. 193 adjoining, on the south, was practically located upon the soil upon the line D D, so as to exclude from lot 194, and to include in the defendants' lands, the whole of the premises which the plaintiffs claim to recover, and that for a period of more than twenty years before the beginning of this action there was an acquiescence by the adjoining owners in such practical location which is conclusive upon them and the parties to this action. The judge, as appears from his opinion in the printed case, held that the mere fixing of the boundary line would not have any such result, and refused to find as a matter · of law that all parties have

for so long a time acquiesced in the practical location of such boundary line that the plaintiffs could not maintain that lot No. 194 extended south of such line, as requested by the counsel for the defendants.

The judge, however, finds that the line known as the line D D was clearly marked upon the soil from 1804 to 1850, and for many years a fence and wall stood upon this line; and that this line during all these years marked the division between the possession of those claiming title to lot 194 and lot 193 and the tenants of lot 193, as the boundary between the lots. He also found that from the filing on the map in which the line D D was shown as the boundary line between said lots in the year 1812 to the year 1866, when the lot in question was sold to Kane, the city without interruption claimed to be the owner in fee of the premises two hundred feet in width lying next south of D D and from 1804 to 1852, the tenants of the city cultivated and improved the premises two hundred feet in width lying next south of said line, and that this was the only line that was ever recognized or treated by the owners or occupants of lots 194 and 193 as the division line between them.

These findings of fact were, we think, sufficiently supported by the evidence as will appear by a reference to the same. The Goerck map which was introduced as testimony upon the trial shows the common land laid out in lots between Forty-second street and the Harlem boundary, that such lots are of uniform width and the distance between Forty-second street and the Harlem boundary. The Randall map, which shows the present plan of the city, indicates a less distance between these two bounds and calls for a smaller quantity of land by twenty-two feet and ten inches than the Goerck map. The measurements down from the Harlem boundary to the center line of street B, on the south side of lot 194 as shown by the Goerck maps, is one hundred and forty feet south of Seventy-ninth street; while up from forty-second street the same line would be only one hundred feet. This diversity cannot be reconciled, and a question therefore arises as to where the true boundary line

actually was between the two lots. And it being in doubt it was entirely competent for the parties to locate such line or to assent thereto if located by either of them, and when once established by a practical location, it must be accepted as the division line between the two lots. (*Ratcliffe* v. *Gray*, 3 Keyes, 510.) In the case last cited it is held, that where, as in this case, the true boundary is uncertain, practical location is of the highest importance. The doctrine as to the practical location of a boundary line is well settled in the courts. It was adopted as a rule of repose with a view of quieting titles, and rests upon the same ground as the statute in reference to adverse possession which has continued for a period of twenty years. (*Baldwin* v. *Brown*, 16 N. Y. 359; *Adams* v. *Rockwell*, 16 Wend. 285.) It applies not only to cases of disputed boundary, but to those about which there can be no real question. (See cases last cited; also, *Vosburgh* v. *Teator*, 32 N. Y. 561.) In *Jones* v. *Smith* (64 N. Y. 180), where it appeared that the adjoining owners for more than fifty years had occupied each on his side up to an old fence, which fence had been put up and maintained as a division fence for more than twenty years by agreement, each owner keeping up one-half, it was held that this was sufficient evidence of a practical location, and an acquiescence in the fence as a boundary line, and of a possession of more than twenty years, in pursuance of such location, to require the submission of that question to the jury.

Even although the party maintaining the fence holds under a paper title which recognizes a different line, the existence of such title does not necessarily destroy the effect of the line, which had been recognized for a long period of time.

A review of the cases is not required as it is quite evident that the line between the adjoining owners of lots 193 and 194 was one which might be fixed by a practical location and acquiescence of the parties. That this was done and the line D D was recognized as the true line, is not a matter of serious question.

From 1804 to 1850, so far as is shown by the evidence, the occupancy of all parties was in strict accordance with this line

as the south boundary, and no one ever disputed that the boundary of lot No. 194 was the line D D on the south. There was evidence showing that this line was recognized as the southern boundary by a city surveyor in several instances, and for many years a boundary wall and fence stood upon the line. The wall from 1810 to 1857, and the fence from a date prior to 1816 until after 1827. The city in 1822 published a map which was kept open to the public as the revised map of the common lands, in which the line D D is shown as the boundary between lot 194 and lot 193. The facts adverted to establish the location of and practical acquiescence in a boundary line between the two lots, and fully justify the findings of fact by the court upon the trial, to which reference has been had, and would have warranted a finding as a conclusion of law as requested by the defendants' counsel that the parties acquiesced in the practical location of the boundary line D D and that the plaintiffs could not maintain that lot No. 194 extended south of such line.

As no such finding was made and no appeal taken by the defendants, and as the judge placed his decision upon another ground, and inasmuch as the defendants were entitled to a judgment upon the ground of adverse possession, which has been considered, it is not necessary to decide whether such judgment might also be sustained upon the question of acquiescence in a practical location of a boundary line between the two lots. Nor is it material to consider in this aspect of the case the questions raised in regard to the southerly and easterly boundary contained in the description in the deed to Walker. The judgment should be affirmed.

All concur. EARL, J., concurring in result on ground of adverse possession.

Judgment affirmed.